The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203

2015 CO 68

Supreme Court Case No. 13SC495 
Certiorari to the Colorado Court of Appeals 
Court of Appeals Case No. 11CA1206

Petitioner: 
The People of the State of Colorado,
v.
Respondent: 
Shannon Nelson.

Order Reversed 
en banc
December 21, 2015

Attorneys for Petitioner:
Cynthia H. Coffman, Attorney General
Christine Brady, Senior Assistant Attorney General
John J. Fuerst III, Senior Assistant Attorney General
Denver, Colorado
Attorneys for Respondent:
Law Office of Suzan Trinh Almony
Suzan Trinh Almony, ADC Attorney
Broomfield, Colorado
CHIEF JUSTICE RICE delivered the Opinion of the Court. JUSTICE HOOD dissents.
JUSTICE GABRIEL does not participate.
 

¶1        This case requires us to decide whether Respondent Shannon Nelson may receive a refund of costs, fees, and restitution that she paid following a conviction. Nelson’s conviction was overturned and she was acquitted after a new trial. We hold that a trial court may not authorize a refund of costs, fees, or restitution following a criminal trial without statutory authority. Because none of the statutes governing the fines, fees, and restitution empowered the trial court to issue a refund, it could not do so. Exonerated defendants may seek a refund of costs, fees, and restitution, but only through a separate civil proceeding, which Nelson did not pursue.
I. Facts and Procedural History
¶2        In 2006, Nelson was convicted of five charges relating to sexual assaults allegedly committed against her children. The trial court sentenced Nelson to prison for twenty years to life, and ordered that she pay court costs, fees, and restitution. Specifically, the trial court ordered Nelson to pay the following costs and fees: (1) $125.00 to the victim compensation fund, (2) $162.50 to the victims and witnesses assistance and law enforcement fund (referred to as the “VAST fund” in the Register of Actions and this opinion), (3) $35.00 for court costs, and (4) a “time payment fee” of $25.00. She was also ordered to pay $7,845.00 in restitution, bringing the total owed to $8,192.50.
¶3        The court of appeals reversed the judgment against Nelson and remanded for a new trial based on the improper use of an unendorsed expert witness. People v. Shannon Kay Gonser, n/k/a Shannon Nelson, No. 06CA1023 (Colo. App. Apr. 9, 2009). In the second trial, a new jury acquitted Nelson of the five charges.

¶4        Between Nelson’s initial conviction and subsequent acquittal, the Department of Corrections withheld $702.10 from her inmate account to pay the costs, fees, and restitution that she owed.[1] Eight months after her acquittal, Nelson filed a motion for a refund of the money she had paid toward the costs, fees, and restitution, arguing that a failure to refund the money would violate state and federal constitutional guarantees of due process. The trial court concluded that it did not have authority to order the Department of Corrections to return the funds. Nelson appealed.
¶5        The court of appeals reversed the trial court’s decision. People v. Nelson, 2013 COA 58, ¶ 36, ___ P.3d ___. It held that when a defendant’s conviction is overturned on appeal and upon retrial she is acquitted, she is entitled to seek a refund of costs and fees, id. at ¶ 16, as well as a refund of restitution, id. at ¶ 21. The court of appeals concluded that an order for a defendant to pay costs, fees, and restitution must be tied to a valid conviction. Id. at ¶¶ 12–13. It then stated that Nelson’s acquittal upon retrial rendered the prior conviction invalid. Id. at ¶¶ 14–16. The court of appeals reasoned that the parties should be “placed in status quo” and Nelson should receive a refund. Id. at ¶ 15 (quoting Toland v. Strohl, 364 P.2d 588, 593 (Colo. 1961)). Finally, the court of appeals determined that the State should issue the refund, because the State’s action caused the “wrongful payment of restitution.” Nelson, ¶ 29. The court of appeals acknowledged that “the [S]tate may be required to refund monies that it has already disbursed to third parties,” id. at ¶ 28, but determined that, by disbursing the funds, the State “assumed the risk that the conviction could ultimately be overturned,” id. at ¶ 30.

¶6        The People then petitioned this court for certiorari, asking whether the trial court may order a refund of restitution and, if so, which branch of the government should shoulder that burden. We granted certiorari to consider whether a trial court could issue refunds of not only restitution, but also costs and fees, and to determine which branch, if any, should pay the refunds.[2]
II. Standard of Review
¶7        Whether a trial court has authority to order a refund of costs, fees, and restitution presents a question of law, which we review de novo. See People v. Porter, 2015 CO 34, ¶ 8, 348 P.3d 922, 924. This case involves issues of statutory construction, which we also review de novo. Mishkin v. Young, 107 P.3d 393, 396 (Colo. 2005).
III. Analysis
¶8        We begin with an overview of the statutes governing the costs, fees, and restitution ordered in this case, then proceed to a discussion of whether a trial court may authorize a refund. We hold that a trial court must have statutory authority to order a refund from public funds. A defendant may seek a refund of costs, fees, and restitution through the refund process created by sections 13-65-101 to -103, C.R.S. (2015) (“the Exoneration Act” or “the Act”). A trial court may not, however, order a refund of costs, fees, and restitution as part of a criminal proceeding without statutory authority to do so.
A. Legal Background

¶9        Nelson seeks reimbursement of restitution, costs, and fees that she paid after her initial conviction. This raises questions about the interplay between numerous statutes that govern the imposition, collection, management, and distribution of costs, fees, and restitution. See, e.g., §§ 13-32-105, 18-1.3-603, 24-4.2-104(1)(d), 24-4.1-119, C.R.S. (2015). A brief review of the relevant statutes is necessary to explain the relationship between them, and how they affect a court’s ability to order a refund.
1. Costs, Fees, and Surcharges
¶10        When Nelson was convicted after the first trial, the court ordered her to pay several costs, fees, and surcharges, totaling $347.50. First, Nelson was ordered to pay $125.00 to the crime victim compensation fund. The court orders a defendant to pay this fine when a criminal action results in a conviction or deferred judgment. § 24-4.1-119. These fines go into the crime victim compensation fund housed in each judicial district. Id.; § 24-4.1-117(1), C.R.S. (2015). Other than a small portion allocated to the fund’s administrative costs, money in the fund is to be used “solely for the compensation of victims.” § 24-4.1-117(5). Nelson paid this fee. 

¶11        Next, the court imposed a separate charge for the VAST fund. § 24-4.2-104(1)(d). The court administrator in each judicial district is responsible for the VAST fund in that district. § 24-4.2-104(1)(a)(I). Fees supporting this fund are “levied on each criminal action resulting in a conviction or in a deferred judgment and sentence.” §§ 24-4.1-119, 24-4.2-104. Nelson paid $162.50 to the VAST fund.
¶12        Nelson was also charged a docket fee of $35.00, which funds the judicial stabilization cash fund and the state commission on judicial performance cash fund. § 13-32-105. Nelson did not pay this docket fee.
¶13        Because Nelson was unable to pay the costs, fees, and restitution on the day that she was ordered to pay, she was charged a time payment fee of $25.00. § 16-11-101.6(1), C.R.S. (2015). This fee is charged each year that the amount owed is not fully paid. Id.  Time payment fees fund the judicial collection enhancement fund, which is located in the state treasury. § 16-11-101.6(2).The General Assembly makes annual
appropriations from the fund to cover “administrative and personnel costs incurred in collecting restitution, fines, costs, fees, and other monetary assessments.” Id. Nelson did not pay the time payment fee.
¶14        Nelson began paying the fees according to a payment plan because she was not able to pay them when she was convicted. When a defendant pays according to a payment plan, the payments are credited in the following order: (1) crime victim compensation fund; (2) VAST fund; (3) restitution; (4) surcharges related to the address confidentiality program; (5) time payment fee; (6) late fees; and (7) any other fines, fees, or surcharges. § 16-18.5-110, C.R.S. (2015). However, the State pays the cost of criminal cases when a defendant is acquitted or when the court determines that the defendant is unable to pay. § 16-18-101(1), C.R.S. (2015). Because Nelson paid only a portion of what she was originally ordered to pay, the money was credited only to the victim compensation fund, the VAST fund, and toward restitution.

2. Restitution
¶15        In addition to these costs and fees, the court ordered Nelson to pay $7,845.00 in restitution to the victims. When a court orders a conviction, it must consider ordering restitution for any victims. § 18-1.3-603. An order of restitution is a “final civil judgment in favor of the state and any victim.” § 18-1.3-603(4)(a). Moreover, “any such judgment shall remain in force until the restitution is paid in full.” Id.
¶16        Restitution becomes “due and payable at the time that the order of conviction is entered.” § 16-18.5-104(1), C.R.S. (2015). If no victim suffered pecuniary loss, then the court does not order restitution. § 18-1.3-603(1)(d). The amount of restitution may be increased if the court learns of additional victims or losses. § 18-1.3-603(3). It may also be decreased, either with the consent of the prosecuting attorney and the victims or if the defendant otherwise compensates the victims. Id.
¶17        The goal of ordering restitution is partly to rehabilitate defendants and deter criminal activity and partly to make victims whole. § 18-1.3-601(1)(c)–(e), C.R.S. (2015). The restitution program aims to fully compensate victims and to take the profit out of crime. § 18-1.3-601(1)(a)–(d); People v. Leonard, 167 P.3d 178, 181 (Colo. App. 2007) (citing People v. Milne, 690 P.2d 829, 836 (Colo. 1984)). 

¶18        If the defendant claims she cannot pay the restitution amount and is incarcerated, then the Department of Corrections investigates the defendant’s ability to pay and establishes a payment plan. § 16-18.5-106, C.R.S. (2015). While a defendant is incarcerated, the Department of Corrections “may direct that a portion of the deposits into such inmate’s bank account be applied to any outstanding balance.” § 16-18.5-106(2). If the defendant is not in custody and claims she cannot pay, she must report to the Collections Investigator, who investigates the defendant’s ability to pay and establishes a payment schedule with the defendant. § 16-18.5-104(3)–(4). The Collections Investigator is responsible for monitoring the defendant’s restitution payments. § 16-18.5-105, C.R.S. (2015).
¶19        Victims have the right to pursue collection of restitution. § 16-18.5-107(1),
C.R.S. (2015). But if a victim elects not to pursue it, the Collections Investigator or Department of Corrections must do so. § 16-18.5-107(4). If “no victim can be reasonably located or the victim declines to accept restitution,” the defendant pays the restitution amount to the State. § 16-18.5-109, C.R.S. (2015). Restitution paid to the State is transferred to the VAST fund in the judicial district where the crime occurred. § 24-4.1-117. The money is then distributed between the VAST fund and the crime victim compensation fund. § 16-18.5-109(3). Of the total amount that Nelson paid, $414.60 was disbursed to the victims as restitution.
3. Crime Victim Compensation Act
¶20        The People suggest that if a court may order a refund of restitution, then the money should come from the crime victim compensation fund. However, an examination of the statutes governing the crime victim compensation fund reveals no authority by which the court could order a withdrawal from this fund to reimburse Nelson.

¶21        In 1981, the General Assembly created the Crime Victim Compensation Program to protect and assist the victims of crimes and their immediate family members by “lessening the financial burden placed upon victims due to the commission of crimes.” § 24-4.1-101, C.R.S. (2015). The General Assembly instructed that the statute be “liberally construed” to accomplish its stated purpose. Id.
¶22        To achieve this purpose, the Crime Victim Compensation Act established a crime victim compensation board (“the board”) in each judicial district. §§ 24-4.1-102(3), -103(1), C.R.S. (2015). In each district, the District Attorney appoints three members to the board. § 24-4.1-103(1). The District Attorney and her staff assist the board in performing its duties. § 24-4.1-104, C.R.S. (2015). This board considers applications to determine whether a victim is entitled to compensation and how much the victim should receive. §§ 24-4.1-106 to -109, C.R.S. (2015).
¶23        The Crime Victim Compensation Act also created a crime victim compensation fund in each judicial district. § 24-4.1-117(1). This fund consists of the money received from costs and surcharges levied on criminal convictions, any federal money available for victim compensation, plus refunds from victims who receive an award from the fund in addition to damages or restitution from the defendant. § 24-4.1-117(2); see also § 24-4.1-119 (listing the costs and surcharges that finance the fund). The fees are “levied on each criminal action resulting in a conviction or in a deferred judgment and sentence.” § 24-4.1-119(1)(a).

¶24        “All moneys deposited in the fund shall be used solely for the compensation of victims,” other than a small carve-out of 12.5% for administrative costs. § 24-4.1-117(5). The District Attorney may use no more than 10% of the fund for administrative costs, and the Court Administrator may use 2.5% for costs. Id.
¶25        The Court Administrator in each judicial district is the custodian of the fund. § 24-4.1-118, C.R.S. (2015). The Court Administrator makes disbursements from the fund to compensate victims upon written authorization of either the board or the court. Id. Each year, the Court Administrators in each judicial district report the amount of money collected and distributed under the fund to the state Court Administrator. § 24­4.1-122, C.R.S. (2015).
¶26        The Crime Victim Compensation Act also created an advisory board, which functions under the Division of Criminal Justice in the Department of Public Safety. § 24-4.1-117.3(1), C.R.S. (2015). The Executive Director of the Department of Public Safety sits on the board and appoints at least seventeen members of various backgrounds to the board. § 24-4.1-117.3(2). The advisory board develops and revises standards for the administration of the fund, investigates and imposes sanctions for violating those standards, distributes seized profits from crime, and advises the division of criminal justice concerning grant awards. § 24-4.1-117.3(3).
¶27        The fund is intended to be the payor of last resort. § 24-4.1-110(2), C.R.S. (2015). When a victim receives compensation from another source (such as restitution from the defendant), in addition to compensation from the fund, the victim must refund either the lesser sum or the amount of compensation that exceeds his losses. Id. Any payment that the victim receives from the fund may not be assigned or subject to attachment until after the victim or his beneficiary actually receives the payment. § 24-4.1-114, C.R.S. (2015). “The acceptance of an award . . . shall subrogate the state, to the extent of such award, to any right or right of action accruing to the applicant.” § 24-4.1-116, C.R.S. (2015).

¶28        The crime victim compensation fund’s purpose is clear: the money is to be used to compensate crime victims. Several bodies—including the board, the advisory board, and the court administrators—exercise some control over the fund. All of these bodies, however, are governed by the same restriction. Other than a small amount dedicated to administrative costs, the fund is to be used “solely for the compensation of victims.” § 24-4.1-117(5) (emphasis added). Nothing in the statute authorizes the court to withdraw funds for a refund to the defendant.
4. The Exoneration Act
¶29        The Exoneration Act authorizes a court to issue refunds to exonerated defendants, but, because Nelson did not file a claim under the Act, it does not apply to this case.[3]See §§ 13-65-101 to -103. In 2013, the General Assembly enacted the Exoneration Act, which created a civil claim for relief for exonerated persons who had been convicted of a felony and sentenced to a term of incarceration. § 13-65-102(1). This statute aims to compensate an innocent person who was wrongly convicted. Ch. 409, sec. 1, 2013 Colo. Sess. Laws 2412, 2412. The Act outlines a process for exonerated defendants to seek a refund of fines, penalties, costs, and restitution, along with additional compensation. §§ 13-65-101 to -103.

¶30        To receive compensation under the Act, the exonerated person must prove, by clear and convincing evidence, that she was “actually innocent.” §§ 13-65-101(1)(a); 13-65-102(1)(a). To be considered actually innocent under the Act, the exonerated person must show either that her conviction was the result of a miscarriage of justice or that she is factually innocent. § 13-65-101(1)(a)(I)–(II). Insufficiency of the evidence or a legal error unrelated to the person’s actual innocence cannot support either exoneration or subsequent compensation under the Act. §§ 13-65-101(1)(b); 13-65-102(2)(a)(I)–(II).
¶31        If a person is exonerated, she is entitled to compensation for her wrongful conviction and sentence. § 13-65-103(1). If a district court finds that the exonerated person is eligible for compensation, it directs the Court administrator to compensate her. Id. The General Assembly funds the Act through a general-fund appropriation, which is allocated to the judicial department. See Ch. 409, sec. 2, 2014 Colo. Sess. Laws. 2381, 2510.
¶32        Compensation from the State may include $70,000.00 per year of incarceration, tuition waivers, and reasonable attorney fees for bringing a claim under the Act. § 13-65-103. The Act also contemplates a refund of all costs and fees that the exonerated person was required to pay as a result of the wrongful conviction. § 13-65-103(2)(e)(V) (stating that an exonerated person may be refunded “[t]he amount any fine, penalty, court costs, or restitution imposed upon and paid by the exonerated person as a result of his or her wrongful conviction or adjudication”).

¶33        Nelson did not seek a refund through this process. She filed a motion for a refund several months after her acquittal, in connection with her criminal trial. Nelson asks this court to determine whether she may seek a refund of costs, fees, and restitution as part of a criminal trial after an initial conviction has been overturned, apart from the process that exists under the Exoneration Act.
B. Statutory Authority for Refunds from Public Funds
¶34        The General Assembly authorizes the collection, management, and distribution of the funds raised by costs, fees, and restitution pursuant to its power to define crimes and sentences, raise revenue, and make appropriations. These powers are inherently legislative, and a court may not intrude on the General Assembly’s power by authorizing a refund from public funds without statutory authority to do so. See Colo. Const. art III; People v. Dist. Court, City & Cty. of Denver, 808 P.2d 831, 835 (Colo. 1991). The Exoneration Act provides the sole statutory authority for the court to issue a refund to criminal defendants after their convictions are overturned. See §§ 13-65-101 to -103.
¶35        As a threshold matter, the court had clear authority to impose, collect, and disburse the costs, fees, and restitution. First, the court correctly ordered—and the Department of Corrections correctly withheld—money from Nelson based on her initial conviction. The General Assembly instructed the court to impose costs, fees, and restitution pursuant to its power to define crimes and prescribe punishments. See Martinez v. People, 69 P.3d 1029, 1031 (Colo. 2003). Courts order defendants to pay costs, fees, and restitution that are tied to criminal convictions—but only to the extent permitted by statute. See id.; see also, e.g., §§ 24-4.1-119, 24-4.2-104(1)(d), 13-32-105, 18-1.3-603. The General Assembly prescribes the punishments for crimes and, in doing so, limits the court’s sentencing authority. People v. Oglethorpe, 87 P.3d 129, 136 (Colo. App. 2003), as modified on denial of reh’g (Aug. 14, 2003). Once the court imposes the sentence, the executive branch carries it out. Id.; see § 16-18.5-106 (authorizing the Department of Corrections to take money from an inmate’s account to pay outstanding fees).

¶36        In Nelson’s case, the court ordered Nelson to pay numerous costs and fees that were each mandated by statute. See, e.g., §§ 24-4.1-119, 24-4.2-104. The statutes instruct that the charges must be levied when a case results in a conviction, and that the defendant must pay the charges. See, e.g., §§ 24-4.1-119, 24-4.2-104. The court must carry out the statutes’ instructions. See Oglethorpe, 87 P.3d at 136. The court must impose the fees when a conviction occurs and must also use the funds as the statutes instruct. Therefore, the trial court properly ordered Nelson to pay costs, fees, and restitution pursuant to valid statutes.
¶37        Next, after collecting fines, fees, and restitution, the court correctly distributed the funds to victims and public funds, as ordered by the statutes. See, e.g., §§ 18-1.3­601, 24-4.1-117, 24-4.2-104. The General Assembly directs when these fees may be collected and how the money may be used based on its power to raise revenue and appropriate funds. See Colo. Const. art. V, §§ 31–32. This power “is plenary, subject only to constitutional limitations.” Colo. Gen. Assembly v. Lamm, 704 P.2d 1371, 1380 (Colo. 1985). The General Assembly must raise revenue to create a source of funding for its appropriations to cover the expenses of the executive, legislative, and judicial departments. Id. at 1380–81 (citing Colo. Const. art. V, §§ 31–32).

¶38        Because the General Assembly must be able to plan and budget to fulfill its duties, Colorado’s constitution protects its control over public money. Colo. Const. art. V, § 33. “No moneys in the state treasury shall be disbursed . . . except upon appropriations made by law, or otherwise authorized by law.” Id. The General Assembly must be able to plan and monitor public money so that sufficient funds are available to support appropriations. Lamm, 704 P.2d at 1381. We have held that the ability to specify which funds support which appropriations, and to make appropriations contingent on the availability of money in those funds, is “essential to the legislative power.” Id.
¶39        In this case, $414.60 was distributed to victims and $347.50 was placed into public funds, according to the statutes governing each fee. A court does not “assume the risk” that a conviction will be overturned by following these statutory commands. Contra Nelson, ¶ 30. Rather, when the court orders a convicted defendant to pay costs, fees, and restitution—pursuant to statutory commands—the court must also follow the statutes’ instructions on how that money may be used. For example, the court was required to distribute the money that Nelson paid toward restitution to the victims. See § 18-1.3-601. Similarly, the court was required to disburse the money collected from costs and fees into public funds. See, e.g., §§ 24-4.1-117(2), 24-4.1-119(1)(a); see also § 16-18.5-109(3) (directing that restitution money be placed in the VAST and crime victim compensation funds when a victim declines to accept restitution or no victim can be reasonably found). The court correctly disbursed the costs, fees, and restitution that Nelson paid to either the victims or public funds, according to the governing statutes.
¶40        Just as the court must follow statutory commands in imposing and disbursing fees, the court may authorize refunds from public funds only pursuant to statutory authority.[4]See People v. $11,200.00 U.S. Currency, 2013 CO 64, ¶ 4, 313 P.3d 554, 555-56 (holding that the trial court lacked authority to order a refund where the defendant’s case did not meet the specific statutory requirements authorizing a refund). The court may not intrude on the legislature’s powers by authorizing refunds from public funds. See Colo. Const. art. III (stating that each branch of government may not intrude on another’s powers absent express constitutional permission); cf. Lamm, 704 P.2d at 1385 (avoiding “the impermissible positive effect” of the executive branch forcing funding to come from otherwise-appropriated funds, which would invade the legislature’s appropriation power). A court order awarding money “payable from public funds implicates sensitive budget and funding considerations, and authority to intrude into these areas is not to be lightly implied.” Dist. Court, City & Cty. of Denver, 808 P.2d at 835. For this reason, we have held that “a monetary sanction payable from public funds . . . is beyond the authority of the trial court.” Id.

¶41        If the court were to refund Nelson’s costs and fees, the refund would draw on public funds, thereby affecting appropriations from that fund. The refund would diminish those public funds and disregard the legislature’s directives on how that money is to be spent or appropriated. This would impermissibly intrude on the legislature’s power and hamstring its ability to fulfill its responsibility to raise and appropriate funds. Therefore, a court must have statutory authority to authorize a refund from public funds, and it did not in this case.
¶42        Finally, we turn to the possible statutory authority that might permit a court to order a refund. Nelson argues that the statutes governing costs, fees, and restitution provide statutory authority to support refunds. Nelson argues that, because the orders to pay costs, fees, and restitution must all be tied to a conviction, her acquittal renders the initial conviction invalid, and the money must be returned. This argument fails for two reasons. First, the court and the Department of Corrections followed the instructions laid out in the statutes governing costs and fees. The court correctly withheld money from Nelson as part of her initial conviction: the fines were tied to a conviction. Furthermore, Nelson was required to make payments toward the costs, fees, and restitution she owed only while her conviction stood. The costs, fees, and restitution were therefore imposed based on a conviction, and the obligation to pay ceased when the conviction was no longer in place. The statutes authorized the imposition and collection of fees but did not address the possibility of a refund.

¶43        Second, the Exoneration Act provides the proper procedure for seeking a refund. When examining the relationship between statutory provisions, “a special or specific statutory provision prevails over a general provision.” Climax Molybdenum Co. v.  Walter, 812 P.2d 1168, 1174 (Colo. 1991) (citing § 2-4-205, 1B C.R.S. (1980) (now codified at § 2-4-205, C.R.S. (2015))). We also presume that the legislature is aware of its prior enactments when it passes new legislation. A.S. v. People, 2013 CO 63, ¶ 11, 312 P.3d 168, 171.
¶44        None of the statutes governing costs, fees, and restitution address whether a court may withdraw money from public funds to refund money that a defendant has already paid. See, e.g., §§ 18-1.3-603, 24-4.1-117, 24-4.1-119. On the other hand, the Exoneration Act specifically addresses when a defendant who was wrongfully convicted may seek a refund of costs, fees, and restitution. § 13-65-103(2)(e)(V). When creating a refund procedure for exonerated defendants, the General Assembly did not amend the existing statutes to create alternative means for defendants to seek a refund. The Exoneration Act created an exclusive process for exonerated defendants seeking a refund of costs, fees, and restitution.
¶45        Therefore, when a defendant’s conviction is overturned and she is acquitted after a new trial, the trial court may authorize a refund of costs, fees, and restitution only pursuant to the process created in the Exoneration Act. Accordingly, the trial court lacked the authority to order a refund of Nelson’s costs, fees, and restitution based on her motion following her criminal trial.

C. No Due Process Violation
¶46        In her motion requesting a refund, Nelson argued that, upon her acquittal, due process required an automatic refund of costs and fees that she had paid. Nelson argues that the money was wrongfully withheld and that the interests of justice require a refund of the costs and fees she paid because her conviction was overturned.[5] We hold that due process does not require a refund of costs, fees, and restitution when a defendant’s conviction is reversed and she is subsequently acquitted. The Exoneration Act provides sufficient process for defendants to seek refunds of costs, fees, and restitution that they paid in connection with their conviction.
¶47        No person shall be denied property without due process of law. U.S. Const. amend. V; id. amend. XIV § 1; Colo. Const. art. II, § 25. “Due process requires, at a minimum, notice and the opportunity for a meaningful hearing before an impartial tribunal.” Van Sickle v. Boyes, 797 P.2d 1267, 1273–74 (Colo. 1990) (citing Mathews v.  Eldridge,424 U.S. 319, 333, 348–49 (1976)). When a criminal defendant is convicted, the court must order defendants to pay certain costs. See supra ¶¶ 10–14; see, e.g., § 24-4.1-119(1)(a) (crime victim compensation fund); § 13-32-105 (docket fees). If a defendant is acquitted, however, section 16-18-101(1) requires the State to pay the court costs.

¶48        In this case, the money was not wrongfully withheld because a conviction supported the imposition of costs, fees, and restitution. See supra ¶¶ 10–14; see also,  e.g., § 16-18.5-104 (stating that restitution becomes “due and payable at the time that the order of conviction is entered”). Nelson was initially convicted after a jury trial, so the court was authorized to order Nelson to pay costs, fees, and restitution at that time. Nelson was not ordered to pay costs and fees for the second trial, when she was acquitted. See § 16-18-101(1). Nelson was obligated to pay only while her conviction was in place and this obligation was imposed pursuant to a valid statute. Accordingly, she was not deprived of due process.
¶49        Moreover, as explained, the General Assembly has provided a process for defendants to seek refunds. See §§ 13-65-101 to -103. Nelson did not file an action under the Exoneration Act, which allows a court to grant refunds of fees and restitution, along with compensation for the time an exonerated defendant spent incarcerated. See  §§ 13-65-101 to -103. Due process does not require a defendant to be compensated automatically for the time she spent incarcerated while seeking an appeal or new trial. Similarly, due process does not require an automatic refund of fines paid in connection with a conviction during that time.
¶50        The Exoneration Act provides sufficient process for defendants to seek a refund of costs, fees, and restitution that they incurred while a conviction was in place. Therefore, requiring a defendant to seek a refund of costs, fees, and restitution through the process created by the legislature, rather than upon a motion after a criminal trial, does not violate due process.

IV. Conclusion
¶51        The trial court did not have the authority to grant a refund of costs, fees, and restitution to Nelson. If a criminal defendant wishes to seek a refund, the Exoneration Act provides the only procedure to do so. Accordingly, we reverse the court of appeals’ ruling and remand the case for proceedings consistent with this opinion.
JUSTICE HOOD dissents.
JUSTICE GABRIEL does not participate.

[1] Nelson states that the amount withheld was $681.35. The Register of Actions, however, shows that the total amount withheld was $702.10. The payments were applied as follows:

 $125.00 to the victim compensation fund;
 $162.50 to the VAST fund; and
 $414.60 to the victims as restitution.

[2] Specifically, we granted certiorari to review the following issues:

 Whether a criminal court has jurisdiction to order a refund of costs, fees, and restitution from the State upon defendant’s post-conviction motion in the criminal case following either his acquittal or his conviction being vacated and the prosecution electing not to retry him.
 Where the court of appeals ordered the State to refund restitution, which branch of the government is responsible for the refund.

[3] The Exoneration Act was not passed until 2013, after Nelson made her initial motion requesting a refund. However, the Act allowed defendants to seek relief, even if they met the criteria prior to the Act’s passage, as long as they acted before June 5, 2015. § 13-65-102(1)(b)(II), C.R.S. (2015). Nelson did not seek a refund through procedures created by the Act in the allotted two-year time frame. Therefore, whether she met the other criteria that the Act demands, such as actual innocence, is not before us.
[4] Once the state disburses restitution to the victims, the state no longer controls that money. See § 18-1.3-601. Neither the defendant nor the court may seek a refund of restitution from the victims. See § 13-65-103(2)(e)(V); see also § 24-4.1-302.5(1)(a), C.R.S. (2015) (affirming victims’ right to be free from harassment). Even when a defendant is exonerated after a finding of actual innocence, victims are not required to reimburse the defendant for any restitution payments they received.       § 13-65-103(2)(e)(V)
(emphasizing that allowing a refund of restitution to an exonerated defendant “shall not be interpreted to require the reimbursement of restitution payments by” a victim). As a result, any potential refund of restitution could come only from a public fund.
[5] Nelson relies on Toland v. Strohl, 364 P.2d 588, 593 (Colo. 1961), to suggest that parties must be placed in the “status quo” after a conviction is reversed. However, Toland does not apply here. Unlike Nelson, the defendant in Toland was subject to a “hasty, ill considered, dark of night disposition” of his case, which was “not an acceptable substitute for a trial.” Id. at 593.
 

JUSTICE HOOD, dissenting.
¶52        The majority concludes the State may deprive a person of her property as a result of a criminal conviction and that it may retain the property even after the person shows on appeal that the conviction is invalid. It finds that, while the legislature has provided for the collection and expenditure of a convicted defendant’s money, the legislature has not provided for refunds and therefore criminal courts lack authority to issue refunds. To obtain relief, the majority requires Shannon Nelson to mount a new lawsuit and prove her innocence under the Compensation for Certain Exonerated Persons Act (“Exoneration Act” or “Act”).
¶53        Because Nelson is legally innocent, I would begin at a different place. Instead of requiring Nelson to identify a specific statute authorizing a refund, I would require the State to identify a source of law allowing it to keep a defendant’s property in the absence of a valid criminal conviction. Because I know of no such authority, and I agree with the court of appeals that the district court had jurisdiction to order a refund, I respectfully dissent.
I. Nelson Has Never Been Validly Convicted.
¶54        The majority quickly moves over the procedural history of Nelson’s case, but it is worth a closer look. In 2006, Nelson stood trial for crimes of sexual abuse allegedly perpetrated against her four children. The prosecution’s case depended heavily on the children’s testimony and out-of-court statements. At trial, the People called as a witness a forensic interviewer who had spoken with the children. When the People posed a question about the nature of children’s memories, Nelson objected because the witness had not been endorsed as an expert. The trial court acknowledged the witness was not qualified as an expert and that in the past it had been “reluctant” to qualify her, but the court felt that based on the interviewer’s continuing training and growing experience she would “at some point in the future . . . be qualifiable as an expert.” The court overruled Nelson’s objection. The interviewer went on to testify about the age at which children have the ability to remember information and relate it accurately; she also described the ways children disclose trauma and the reliability of such disclosures. The jury convicted Nelson of five charges—sexual assault on a child, aggravated incest, and three counts of misdemeanor child abuse. She appealed.

¶55        The court of appeals reversed her convictions in a unanimous opinion. People v. Shannon Kay Gonser, n/k/a/ Shannon Nelson, No. 06CA1023 (Colo. App. Apr. 9, 2009). The division concluded the trial court erred by allowing a lay witness to testify on matters requiring specialized knowledge and training. It further concluded this error was prejudicial. The error impaired the fairness of Nelson’s trial by affecting the jury’s ability to evaluate the credibility of the alleged victims. Consequently, the court reversed her convictions and remanded for a new trial.
¶56        The prosecution retried Nelson. A jury acquitted her.
¶57        Because Nelson was never validly convicted, we presume she is innocent. This, of course, is one of our bedrock concepts of criminal justice. See Coffin v. United States, 156 U.S. 432, 453 (1895) (“[The presumption of innocence] is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.”). Thus, just as the State was required to release Nelson from incarceration, it should also be required to release Nelson’s money paid as costs, fees, and restitution.

II. The State’s Appellate Process Must Comport with Due Process.
¶58        This case stands at the confluence of the legislature’s choice to provide appellate review of convictions and its choice to collect money from defendants before convictions are final. Though the Supreme Court has said the federal Constitution guarantees no right to an appeal, see McKane v. Durston, 153 U.S. 684, 687 (1894), when the legislature creates one, as Colorado has done, see § 16-12-101, C.R.S. (2015), a criminal defendant is entitled to due process throughout the appeal. Hoang v. People, 2014 CO 27, ¶ 39, 323 P.3d 780, 788; see also, e.g., Evitts v. Lucey, 469 U.S. 387, 396 (1985) (holding that when a state provides a first appeal as of right, due process requires that defendants receive the effective assistance of counsel during that appeal). Knowing this, the legislature might have decided not to order defendants to pay costs, fees, and restitution until judgments survive direct appeal. While requiring defendants to pay up sooner is understandable, I struggle to see how we can sanction a system that makes money immediately due without providing for its return when reversible error occurs.
¶59        Like the majority, I see nothing wrong with a court following the statutory plan for the collection and use of a convicted defendant’s funds, see maj. op. ¶ 39; nor is there anything objectionable about requiring defendants to comply with existing court orders to pay costs, fees, and restitution stemming from valid convictions and requiring defendants who wish to challenge their convictions to use the normal channels. But when the process leading to the conviction is exposed as so deficient as to mandate reversal, “due” process should also allow for the return of a defendant’s money.

¶60        This court shared my concern in Toland v. Strohl, 364 P.2d 588, 593 (Colo. 1961), when we required the return of a defendant’s fines and costs paid pursuant to a conviction obtained in violation of due process. Today, the majority relegates Toland to a footnote and emphasizes that the defendant there suffered a summary disposition of his case immediately after arrest—a situation that presented obvious due process problems. See maj. op. ¶ 46, n.5; Toland, 364 P.2d at 593 (concluding the “summary, hasty, middle of the night justice” dispensed to a suspected drunk driver after a crash did not comport with due process). By distinguishing Toland, the majority sets up two tiers of invalid convictions: There are stark constitutional violations, like those in Toland, that demand setting the defendant back to the status quo ante, and then there are arguably less egregious but nonetheless invalid convictions, like Nelson’s, for which reimbursement is unavailable. But reversal is reversal. And an invalid conviction is no conviction at all.
¶61        Other courts have recognized what the interests of justice compel in similar circumstances. See United States v. Hayes, 385 F.3d 1226, 1229–30 (9th Cir. 2004) (holding that, where the defendant’s conviction was reversed on collateral review, the government must return amounts paid as special assessments and costs, though it need not reimburse for restitution disbursed after the conviction became final); Telink, Inc. v.  United States, 24 F.3d 42, 47 (9th Cir. 1994) (“If [the defendants] prevail in setting aside their convictions, the wrongly paid fines would be automatically refunded, without requiring a civil action . . . .”); United States v. Lewis, 478 F.2d 835, 836 (5th Cir. 1973) (“Since the district court was empowered to set aside the conviction, it could also correct the unlawful result of the conviction and require the repayment of the money collected as fines.”); United States v. Beckner, 16 F. Supp. 2d 677, 679 (M.D. La. 1998) (“[T]his court has jurisdiction to carry out its obligation to completely vacate all aspects of the erroneous judgement [sic] issued by it. . . . In this criminal case the final judgment is that Beckner owed restitution to no one. . . . The government must reimburse Beckner . . . .”); United States v. Venneri, 782 F. Supp. 1091, 1092–95 (D. Md. 1991) (describing previous order requiring government to refund a defendant’s fine paid for violating an unconstitutional statute and ordering third-party restitution recipient to repay defendant); Cooper v. Gordon, 389 So. 2d 318, 319 (Fla. Dist. Ct. App. 1980) (holding lower court had inherent power to restore defendant to status quo ante for wrongly paid fine, restitution, and probation costs); Commonwealth v. McKee, 38 A.3d 879, 881 (Pa. Super. Ct. 2012) (finding trial court had jurisdiction to consider defendant’s refund petition after his convictions were overturned on direct appeal). But see Hooper v. State, 248 P.3d 748, 751 (Idaho 2011) (holding that the trial court could not award a refund of restitution where the defendant’s payments had gone to the state’s Industrial Commission over which the court lacked personal jurisdiction).

¶62        The majority finds no due process problem and refers Nelson to the Exoneration Act. See maj. op. ¶¶ 29–33, 46–50 (discussing §§ 13-65-101 to -103, C.R.S. (2015)). It proceeds as though litigants merely needed directions on where to ask for relief. See id. at ¶ 33 (explaining that Nelson filed a motion in criminal court instead of filing a civil claim). But the Exoneration Act is not the answer to Nelson’s problem.

III. The Exoneration Act Is an Inadequate Remedy.
¶63        The Act is not up to the task the majority assigns it for several reasons. First and foremost, requiring defendants who have never been validly convicted to resort to this Act flips the presumption of innocence. The Act establishes a separate civil claim that puts the burden on the petitioner to demonstrate her actual innocence by clear and convincing evidence. § 13-65-102(4)(a)(I), (6)(b).
¶64        Second, the Act is not geared toward refunds. As the majority explains, the Exoneration Act provides not just a refund but also $70,000 for every year of wrongful incarceration, plus attorneys’ fees and other benefits. See maj. op. ¶ 32; see also § 13-65-103(2)–(3). The legislature is free to establish this broad relief and to require a petitioner to prove she is entitled to it. But Nelson is not seeking such broad relief; she is merely asking for a return to the status quo ante.[1]See Toland, 364 P.2d at 593.
¶65        Third, the majority ignores the impracticability of bringing a separate civil action. Defendants are not entitled to state-provided counsel in this context, which means they must retain a lawyer or find one willing to work for free. Defendants with meritorious claims paying hourly rates could find themselves throwing good money after bad, while the relatively low amounts available will likely prevent most defendants from retaining counsel on a contingency basis.

¶66        Therefore, I respectfully disagree with the majority’s determination that the Exoneration Act provides “sufficient process” for defendants in Nelson’s situation. Maj. op. ¶ 46. The Act serves different goals and provides a different remedy. Of course, this begs the question whether the judiciary has the authority to provide an alternative remedy.
IV. The Criminal Court May Award a Refund.
¶67        Ancillary jurisdiction gives us that authority. In a well-reasoned and unanimous opinion, authored by then-Judge Gabriel, the court of appeals relied on the ancillary jurisdiction analysis articulated in Morrow v. District of Columbia, 417 F.2d 728, 740 (D.C. Cir. 1969), and previously used by the court of appeals in People v. Hargrave, 179 P.3d 226, 229–30 (Colo. App. 2007). See People v. Nelson, 2013 COA 58, ¶¶ 24–26, __ P.3d __.
¶68        Ancillary jurisdiction allows a court to decide certain matters related to the principal proceeding. “[A]ll courts, absent some specific statutory denial of power, possess ancillary powers to effectuate their jurisdiction.” Morrow, 417 F.2d at 737. At issue in Morrow was whether a criminal court could issue an order preventing the dissemination of a defendant’s arrest record after the case stemming from his arrest was dismissed. The United States Court of Appeals for the District of Columbia Circuit held the city’s criminal court did have such ancillary jurisdiction. Id. at 740–41. “The major purpose of ancillary jurisdiction . . . is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party’s actions, either directly or indirectly, threaten to compromise the effect of the court’s judgment.” Id. at 740.

¶69        Applying the test articulated in Morrow, see id., the court of appeals concluded the trial court had ancillary jurisdiction over Nelson’s refund petition: The refund matter arose from the same transaction as the main proceeding (Nelson’s criminal case); deciding the refund question did not require substantial new factfinding; nor would adjudication deprive a party of a substantial procedural or substantive right; and finally, resolution of the ancillary matter was required to prevent frustration of the underlying criminal matter. Nelson, ¶ 25 (citing Hargrave, 179 P.3d at 229–30).
¶70        The court of appeals justifiably noted this approach also (1) serves judicial economy by preempting the need for defendants to file a separate civil action, see id. at ¶¶ 23, 26; see also Morrow, 417 F.2d at 740 (citing judicial economy as another purpose of ancillary jurisdiction); and (2) avoids “a scenario in which former criminal defendants are left to seek out and file lawsuits or other proceedings against third parties, and especially crime victims, to recover the restitution amounts that the defendants previously paid,” Nelson, ¶ 31.
¶71        The majority raises another jurisdictional concern with this approach, one implicating the separation of powers. See maj. op. ¶ 34. Apart from a court’s ability to hear a defendant’s request for a refund, the majority argues courts cannot award a refund of costs, fees, and restitution in the absence of statutory authorization. See id. at ¶ 40. To grant a refund without statutory backing would be, in the majority’s view, to “intrude on the General Assembly’s power” to define crimes and sentences, raise revenue, and make appropriations. Id. at ¶ 34. These powers are undeniably important and they undoubtedly reside in the legislature, but they are nevertheless subject to constitutional constraints such as due process. See Colo. Const. art. II, § 25 (“No person shall be deprived of life, liberty or property, without due process of law.”).

¶72        Refunds simply recognize that the legislature lacks power to punish people who have not been validly convicted. They do not intrude on the power to define crimes and sentences.
¶73        As for the budgetary powers, the legislature itself recognizes the State’s obligation to provide the court system with the resources it needs to function: Section 13-3-104—“State shall fund courts”—provides, “The state of Colorado shall provide funds by annual appropriation for the operations, salaries, and other expenses of all courts of record within the state . . . .” § 13-3-104(1), C.R.S. (2015). As I see it, the obligation to refund money taken from defendants whom the State never validly convicted is part of the “operations” of courts; it is the cost of doing business, or here, an expense of doing justice.
¶74        Despite this, the majority argues that our precedent prohibits a court from ordering a refund absent more specific statutory authority. Our cases do not stand for such a broad principle. The majority leads with People v. $11,200.00 U.S. Currency, 2013 CO 64, 313 P.3d 554, where a defendant sought a refund of money lost through civil forfeiture. He relied on a particular statute that provided for the return of property only where the related criminal action terminated in an acquittal or dismissal while the forfeiture action was pending. See id. at ¶¶ 4, 13, 313 P.3d at 555–56, 558 (discussing § 16-13-307(1.6), C.R.S. (2013)). The defendant’s forfeiture action, which we repeatedly stressed he never bothered to appeal, see id. at ¶¶ 3, 8, 28, 313 P.3d at 555–57, 561, became final long before his conviction was reversed on appeal, see id. at ¶¶ 5–10, 313 P.3d at 556–57. Thus, in that situation, that statute did not cover that defendant. Here, by contrast, Nelson seeks relief from the invalid criminal convictions themselves; she appealed those convictions and won. And while the restitution obligation is an independent civil judgment, see § 18-1.3-603(4)(a), C.R.S. (2015), it is tethered to the criminal conviction, see § 18-1.3-603(1) (“Every order of conviction . . . shall include consideration of restitution.”). Indeed, restitution is punishment for the crime. See § 18-1.3-601(1)(b)–(d) (setting forth “moral,” rehabilitative, and deterrence rationales).
¶75        The majority also relies on People v. District Court, 808 P.2d 831, 835 (Colo. 1991), where we merely held that a trial court’s remedial authority under Crim. P. 16 does not include the power to order the prosecution to pay the defendant’s attorneys’ fees. But a trial court’s power to redress discovery abuses does not address our issue here: Whether the criminal court can refund costs, fees, and restitution to a defendant who was not validly convicted. Moreover, even if the case stood for the broad proposition the majority cites—“a monetary sanction payable from public funds . . . is beyond the authority of the trial court,” maj. op. ¶ 40 (omission in original) (quoting Dist. Court, 808 P.2d at 835)—a refund is not a “sanction” against the government; it is the return of a defendant’s money.

¶76        Thus, our cases do not hold that the State may retain a defendant’s funds after she demonstrates her conviction is invalid. In fact, our closest case says just the opposite. See Toland, 364 P.2d at 593.

¶77        Furthermore, the majority concedes that Nelson’s repayment obligation “ceased when the conviction was no longer in place.” Maj. op. ¶ 42; see also id. at ¶ 48 (“Nelson was obligated to pay only while her conviction was in place . . . .”). Thus, the majority allows a court to grant a defendant prospective relief from an outstanding financial obligation that traces to an invalid conviction. This means the majority allows a court to cut off the flow of funds to victims and the State, but forbids a court-ordered refund. Yet the same reasoning compels relief in both directions: The defendant was not validly convicted.
¶78        The majority’s budgetary concerns should also be tempered by the reality that many defendants are indigent and most convictions are affirmed. In fiscal year 2014, the court of appeals outright reversed on direct appeal in only 45 criminal cases, and, dating back to 2005, the annual number was never more than 67 (fiscal year 2008).[2]Even these numbers somewhat overstate the matter. The relevant number is the number of cases where, after reversal, the defendant was acquitted or never retried. And from within this group, only the defendants who paid something in the interim are affected. Nelson paid barely more than $700 while subject to her invalid convictions. While from the perspective of the State’s total budget these sums are small, the underlying due process principle is large.

¶79        The legislature’s choice to provide appellate review of convictions, when met with its choice to collect money from defendants before those convictions become final, implicates difficult public policy questions. Given the logistical complexities, the court of appeals was right to invite legislative participation. See Nelson, ¶ 34. But unlike the majority, I would require the legislature to confront those challenges. The legislature may decide for itself how to provide refunds, but I would not allow the State to retain a defendant’s money on the basis of a conviction known to be invalid.
¶80        I conclude that the State was not authorized to retain Nelson’s money. The district court had jurisdiction to order a refund. Therefore, I respectfully dissent.

[1] The Exoneration Act provides Nelson no recourse whatsoever for the money withheld due to her invalid misdemeanor convictions. Though misdemeanor convictions can subject individuals to various costs, see, e.g., § 24-4.1-119(1)(a), C.R.S. (2015) (imposing $78 charge for a misdemeanor conviction), and restitution, see § 18-1.3-603(1), C.R.S. (2015), the Exoneration Act grants relief only to “a person who has been convicted of a felony,” § 13-65-102(1)(a) (emphasis added).
[2] Data obtained from the Clerk of the Colorado Supreme Court and the Colorado Court of Appeals.