(Slip Opinion) OCTOBER TERM, 2016 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NELSON *v.* COLORADO

### CERTIORARI TO THE COLORADO SUPREME COURT

No. 15–1256. Argued January 9, 2017—Decided April 19, 2017*

Petitioner Shannon Nelson was convicted by a Colorado jury of two felonies and three misdemeanors arising from the alleged sexual and physical abuse of her four children. The trial court imposed a prison term of 20 years to life and ordered her to pay $8,192.50 in court costs, fees, and restitution. On appeal, Nelson's conviction was reversed for trial error, and on retrial, she was acquitted of all charges.

Petitioner Louis Alonzo Madden was convicted by a Colorado jury of attempting to patronize a prostituted child and attempted sexual assault. The trial court imposed an indeterminate prison sentence and ordered him to pay $4,413.00 in costs, fees, and restitution. After one of Madden's convictions was reversed on direct review and the other vacated on postconviction review, the State elected not to appeal or retry the case.

The Colorado Department of Corrections withheld $702.10 from Nelson's inmate account between her conviction and acquittal, and Madden paid the State $1,977.75 after his conviction. In both cases, the funds were allocated to costs, fees, and restitution. Once their convictions were invalidated, both petitioners moved for return of the funds. Nelson's trial court denied her motion outright, and Madden's postconviction court allowed a refund of costs and fees, but not restitution. The Colorado Court of Appeals concluded that both petitioners were entitled to seek refunds of all they had paid, but the Colorado Supreme Court reversed. It reasoned that Colorado's Compensation for Certain Exonerated Persons statute (Exoneration Act or Act), Colo. Rev. Stat. §§13–65–101, 13–65–102, 13–65–103, provided the exclusive authority for refunds and that, because nei-

——————

*Together with *Madden* v. *Colorado*, also on certiorari to the same court (see this Court's Rule 12.4).

ther Nelson nor Madden had filed a claim under that Act, the courts
lacked authority to order refunds. The Colorado Supreme Court also
held that there was no due process problem under the Act, which
permits Colorado to retain conviction-related assessments unless and
until the prevailing defendant institutes a discrete civil proceeding
and proves her innocence by clear and convincing evidence.

*Held*: The Exoneration Act's scheme does not comport with the Four-
  teenth Amendment's guarantee of due process. Pp. 5–11.

  (a) The procedural due process inspection required by *Mathews* v.
*Eldridge*, 424 U. S. 319, governs these cases. *Medina* v. *California*,
505 U. S. 437, controls when state procedural rules that are part of
the criminal process are at issue. These cases, in contrast, concern
the continuing deprivation of property after a conviction has been re-
versed or vacated, with no prospect of reprosecution. Pp. 5–6.

  (b) The three considerations balanced under *Mathews*—the private
interest affected; the risk of erroneous deprivation of that interest
through the procedures used; and the governmental interest at
stake—weigh decisively against Colorado's scheme. Pp. 6–10.

      (1) Nelson and Madden have an obvious interest in regaining the
money they paid to Colorado. The State may not retain these funds
simply because Nelson's and Madden's convictions were in place
when the funds were taken, for once those convictions were erased,
the presumption of innocence was restored. See, *e.g.*, *Johnson* v. *Mis-
sissippi*, 486 U. S. 578, 585. And Colorado may not presume a per-
son, adjudged guilty of no crime, nonetheless guilty *enough* for mone-
tary exactions. Pp. 6–8.

      (2) Colorado's scheme creates an unacceptable risk of the errone-
ous deprivation of defendants' property. The Exoneration Act condi-
tions refund on defendants' proof of innocence by clear and convinc-
ing evidence, but defendants in petitioners' position are presumed
innocent. Moreover, the Act provides no remedy for assessments tied
to invalid misdemeanor convictions. And when, as here, the recoup-
ment amount sought is not large, the cost of mounting a claim under
the Act and retaining counsel to pursue it would be prohibitive.

  Colorado argues that an Act that provides sufficient process to
compensate a defendant for the loss of her liberty must suffice to
compensate a defendant for the lesser deprivation of money. But
Nelson and Madden seek the return of their property, not compensa-
tion for its temporary deprivation. Just as restoration of liberty on
reversal of a conviction is not compensation, neither is the return of
money taken by the State on account of the conviction. Other proce-
dures cited by Colorado—the need for probable cause to support crim-
inal charges, the jury-trial right, and the State's burden to prove
guilt beyond a reasonable doubt—do not address the risk faced by a

Syllabus

defendant whose conviction has been overturned that she will not recover funds taken from her based solely on a conviction no longer valid. Pp. 8–10.

(3) Colorado has no interest in withholding from Nelson and Madden money to which the State currently has zero claim of right. The State has identified no equitable considerations favoring its position, nor indicated any way in which the Exoneration Act embodies such considerations. P. 10.

362 P. 3d 1070 (first judgment) and 364 P. 3d 866 (second judgment), reversed and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion. GORSUCH, J., took no part in the consideration or decision of the cases.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–1256

SHANNON NELSON, PETITIONER *v.* COLORADO

LOUIS A. MADDEN, PETITIONER *v.* COLORADO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

[April 19, 2017]

JUSTICE GINSBURG delivered the opinion of the Court.

When a criminal conviction is invalidated by a reviewing court and no retrial will occur, is the State obliged to refund fees, court costs, and restitution exacted from the defendant upon, and as a consequence of, the conviction? Our answer is yes. Absent conviction of a crime, one is presumed innocent. Under the Colorado law before us in these cases, however, the State retains conviction-related assessments unless and until the prevailing defendant institutes a discrete civil proceeding and proves her innocence by clear and convincing evidence. This scheme, we hold, offends the Fourteenth Amendment's guarantee of due process.

I

A

Two cases are before us for review. Petitioner Shannon Nelson, in 2006, was convicted by a Colorado jury of five counts—two felonies and three misdemeanors—arising from the alleged sexual and physical abuse of her four children. 362 P. 3d 1070, 1071 (Colo. 2015); App. 25–26.

The trial court imposed a prison sentence of 20 years to life and ordered Nelson to pay court costs, fees, and restitution totaling $8,192.50. 362 P. 3d, at 1071. On appeal, Nelson's conviction was reversed for trial error. *Ibid.* On retrial, a new jury acquitted Nelson of all charges. *Ibid.*

Petitioner Louis Alonzo Madden, in 2005, was convicted by a Colorado jury of attempting to patronize a prostituted child and attempted third-degree sexual assault by force. See 364 P. 3d 866, 867 (Colo. 2015). The trial court imposed an indeterminate prison sentence and ordered Madden to pay costs, fees, and restitution totaling $4,413.00. *Ibid.* The Colorado Supreme Court reversed one of Madden's convictions on direct review, and a post-conviction court vacated the other. *Ibid.* The State elected not to appeal or retry the case. *Ibid.*

Between Nelson's conviction and acquittal, the Colorado Department of Corrections withheld $702.10 from her inmate account, $287.50 of which went to costs and fees[1] and $414.60 to restitution. See 362 P. 3d, at 1071, and n. 1. Following Madden's conviction, Madden paid Colorado $1,977.75, $1,220 of which went to costs and fees[2] and $757.75 to restitution. See 364 P. 3d, at 867. The sole legal basis for these assessments was the fact of Nelson's and Madden's convictions.[3] Absent those convictions,

——————

[1] Of the $287.50 for costs and fees, $125 went to the victim compensation fund and $162.50 to the victims and witnesses assistance and law enforcement fund (VAST fund). See 362 P. 3d 1070, 1071, n. 1 (Colo. 2015).

[2] Of the $1,220 for costs and fees, $125 went to the victim compensation fund and $1,095 to the VAST fund ($1,000 of which was for the special advocate surcharge). See App. 79; 364 P. 3d 866, 869 (Colo. 2015).

[3] See Colo. Rev. Stat. §24–4.1–119(1)(a) (2005) (levying victim-compensation-fund fees for "each criminal action resulting in a conviction or in a deferred judgment and sentence"); §24–4.2–104(1)(a)(1)(I) (2005) (same, for VAST fund fees); §24–4.2–104(1)(a)(1)(II) (same, for special advocate surcharge); §18–1.3–603(1) (2005) (with one exception,

Colorado would have no legal right to exact and retain petitioners' funds.

Their convictions invalidated, both petitioners moved for return of the amounts Colorado had taken from them. In Nelson's case, the trial court denied the motion outright. 362 P. 3d, at 1071. In Madden's case, the postconviction court allowed the refund of costs and fees, but not restitution. 364 P. 3d, at 867–868.

The same Colorado Court of Appeals panel heard both cases and concluded that Nelson and Madden were entitled to seek refunds of all they had paid, including amounts allocated to restitution. See *People* v. *Nelson*, 369 P. 3d 625, 628–629 (2013); *People* v. *Madden*, 2013 WL 1760869, \*1 (Apr. 25, 2013). Costs, fees, and restitution, the court held, must be "tied to a valid conviction," 369 P. 3d, at 627–628, absent which a court must "retur[n] the defendant to the status quo ante," 2013 WL 1760869, at \*2.

The Colorado Supreme Court reversed in both cases. A court must have statutory authority to issue a refund, that court stated. 362 P. 3d, at 1077; 364 P. 3d, at 868. Colorado's Compensation for Certain Exonerated Persons statute (Exoneration Act or Act), Colo. Rev. Stat. §§13–65–101, 13–65–102, 13–65–103 (2016), passed in 2013, "provides the proper procedure for seeking a refund," the court ruled. 362 P. 3d, at 1075, 1077. As no other statute addresses refunds, the court concluded that the Exoneration Act is the "exclusive process for exonerated defendants

──────────

"[e]very order of conviction . . . shall include consideration of restitution"). See also 362 P. 3d, at 1073 ("[T]he State pays the cost of criminal cases when a defendant is acquitted." (citing Colo. Rev. Stat. §16–18–101(1) (2015))). Under Colorado law, a restitution order tied to a criminal conviction is rendered as a separate civil judgment. See §18–1.3–603(4)(a) (2005). If the conviction is reversed, any restitution order dependent on that conviction is simultaneously vacated. See *People* v. *Scearce*, 87 P. 3d 228, 234–235 (Colo. App. 2003).

seeking a refund of costs, fees, and restitution." *Id.*, at 1078.[4] Because neither Nelson nor Madden had filed a claim under the Act, the court further determined, their trial courts lacked authority to order a refund. *Id.*, at 1075, 1078; 364 P. 3d, at 867.[5] There was no due process problem, the court continued, because the Act "provides sufficient process for defendants to seek refunds of costs, fees, and restitution that they paid in connection with their conviction." 362 P. 3d, at 1078.

Justice Hood dissented in both cases. Because neither petitioner has been validly convicted, he explained, each must be presumed innocent. *Id.*, at 1079 (*Nelson*); 364 P. 3d, at 870 (adopting his reasoning from *Nelson* in *Madden*). Due process therefore requires some mechanism "for the return of a defendant's money," Justice Hood maintained, 362 P. 3d, at 1080; as the Exoneration Act required petitioners to prove their innocence, the Act, he concluded, did not supply the remedy due process demands, *id.*, at 1081. We granted certiorari. 579 U. S. ___ (2016).

B

The Exoneration Act provides a civil claim for relief "to compensate an innocent person who was wrongly convicted." 362 P. 3d, at 1075. Recovery under the Act is available only to a defendant who has served all or part of a term of incarceration pursuant to a felony conviction, and whose conviction has been overturned for reasons other

_____

[4] While these cases were pending in this Court, Colorado passed new legislation to provide "[r]eimbursement of amounts paid following a vacated conviction." See Colo. House Bill 17–1071 (quoting language for Colo. Rev. Stat. §18–1.3–703, the new provision). That legislation takes effect September 1, 2017, and has no effect on the cases before us.

[5] Prior to the Exoneration Act, the Colorado Supreme Court recognized the competence of courts, upon reversal of a conviction, to order the refund of monetary exactions imposed on a defendant solely by reason of the conviction. *Toland* v. *Strohl*, 147 Colo. 577, 586, 364 P. 2d 588, 593 (1961).

than insufficiency of evidence or legal error unrelated to actual innocence. See §13–65–102. To succeed on an Exoneration Act claim, a petitioner must show, by clear and convincing evidence, her actual innocence of the offense of conviction. §§13–65–101(1), 13–65–102(1). A successful petitioner may recoup, in addition to compensation for time served,[6] "any fine, penalty, court costs, or restitution . . . paid . . . as a result of his or her wrongful conviction." *Id.*, at 1075 (quoting §13–65–103(2)(e)(V)).

Under Colorado's legislation, as just recounted, a defendant must prove her innocence by clear and convincing evidence to obtain the refund of costs, fees, and restitution paid pursuant to an invalid conviction. That scheme, we hold, does not comport with due process. Accordingly, we reverse the judgment of the Supreme Court of Colorado.

## II

The familiar procedural due process inspection instructed by *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), governs these cases. Colorado argues that we should instead apply the standard from *Medina* v. *California*, 505 U. S. 437, 445 (1992), and inquire whether Nelson and Madden were exposed to a procedure offensive to a fundamental principle of justice. *Medina* "provide[s] the appropriate framework for assessing the validity of state procedural rules" that "are part of the criminal process." *Id.*, at 443. Such rules concern, for example, the allocation of burdens of

---

[6] Compensation under the Exoneration Act includes $70,000 per year of incarceration for the wrongful conviction; additional sums per year served while the defendant is under a sentence of death, or placed on parole or probation or on a sex offender registry; compensation for child support payments due during incarceration; tuition waivers at state institutions of higher education for the exonerated person and for any children conceived or legally adopted before the incarceration; and reasonable attorney's fees for bringing an Exoneration Act claim. §13–65–103(2), (3) (2016).

proof and the type of evidence qualifying as admissible.[7]
These cases, in contrast, concern the continuing depriva-
tion of property after a conviction has been reversed or
vacated, with no prospect of reprosecution. See *Kaley* v.
*United States*, 571 U. S. ___, ___, n. 4 (2014) (ROBERTS,
C. J., dissenting) (slip op., at 10–11, n. 4) (explaining the
different offices of *Mathews* and *Medina*). Because no
further criminal process is implicated, *Mathews* "provides
the relevant inquiry." 571 U. S., at ___ (slip op., at 11,
n. 4).

## III

Under the *Mathews* balancing test, a court evaluates
(A) the private interest affected; (B) the risk of erroneous
deprivation of that interest through the procedures used;
and (C) the governmental interest at stake. 424 U. S., at
335. All three considerations weigh decisively against
Colorado's scheme.

## A

Nelson and Madden have an obvious interest in regain-
ing the money they paid to Colorado. Colorado urges,
however, that the funds belong to the State because Nel-
son's and Madden's convictions were in place when the
funds were taken. Tr. of Oral Arg. 29–31. But once those
convictions were erased, the presumption of their inno-
cence was restored. See, *e.g.*, *Johnson* v. *Mississippi*, 486
U. S. 578, 585 (1988) (After a "conviction has been re-
versed, unless and until [the defendant] should be retried,

_____

[7] See *Cooper* v. *Oklahoma*, 517 U. S. 348, 356–362 (1996) (standard of
proof to establish incompetence to stand trial); *Dowling* v. *United
States*, 493 U. S. 342, 343–344, 352 (1990) (admissibility of testimony
about a prior crime of which the defendant was acquitted); *Patterson* v.
*New York*, 432 U. S. 197, 198, 201–202 (1977) (burden of proving
affirmative defense); *Medina* v. *California*, 505 U. S. 437, 443–446, 457
(1992) (burden of proving incompetence to stand trial).

he must be presumed innocent of that charge.").[8]
"[A]xiomatic and elementary," the presumption of inno-
cence "lies at the foundation of our criminal law." *Coffin* v.
*United States*, 156 U. S. 432, 453 (1895).[9]  Colorado may
not retain funds taken from Nelson and Madden solely
because of their now-invalidated convictions, see *supra*, at
2–3, and n. 3, for Colorado may not presume a person,
adjudged guilty of no crime, nonetheless guilty *enough* for
monetary exactions.[10]

That petitioners prevailed on subsequent review rather
than in the first instance, moreover, should be inconse-
quential.  Suppose a trial judge grants a motion to set
aside a guilty verdict for want of sufficient evidence.  In
that event, the defendant pays no costs, fees, or restitu-
tion.  Now suppose the trial court enters judgment on a
guilty verdict, ordering cost, fee, and restitution payments

---

[8] Citing *Bell* v. *Wolfish*, 441 U. S. 520 (1979), Colorado asserts that
"[t]he presumption of innocence applies only at criminal trials" and
thus has no application here.  Brief for Respondent 40, n. 19.  Colorado
misapprehends *Wolfish*.  Our opinion in that case recognized that
"under the Due Process Clause," a detainee who "has not been adjudged
guilty of any crime" may not be punished.  441 U. S., at 535–536; see
*id.*, at 535–540.  *Wolfish* held only that the presumption does not
prevent the government from "detain[ing a defendant] to ensure his
presence at trial . . . so long as [the] conditions and restrictions [of his
detention] do not amount to punishment, or otherwise violate the
Constitution." *Id.*, at 536–537.

[9] Were *Medina* applicable, Colorado's Exoneration Act scheme would
similarly fail due process measurement.  Under *Medina*, a criminal
procedure violates due process if "it offends some principle of justice so
rooted in the traditions and conscience of our people as to be ranked as
fundamental."  505 U. S., at 445 (quoting *Patterson*, 432 U. S., at 202).
The presumption of innocence unquestionably fits that bill.

[10] Colorado invites a distinction between convictions merely "void-
able," rather than "void," and urges that the invalidated convictions here
fall in the voidable category.  See Brief for Respondent 32–33, and
n. 11.  As Justice Hood noted in dissent, however, "reversal is reversal,"
regardless of the reason, "[a]nd an invalid conviction is no conviction at
all."  362 P. 3d, at 1080.

by reason of the conviction, but the appeals court upsets the conviction for evidentiary insufficiency. By what right does the State retain the amount paid out by the defendant? "[I]t should make no difference that the *reviewing* court, rather than the trial court, determined the evidence to be insufficient." *Burks* v. *United States*, 437 U. S. 1, 11 (1978). The vulnerability of the State's argument that it can keep the amounts exacted so long as it prevailed in the court of first instance is more apparent still if we assume a case in which the sole penalty is a fine. On Colorado's reasoning, an appeal would leave the defendant emptyhanded; regardless of the outcome of an appeal, the State would have no refund obligation. See Tr. of Oral Arg. 41, 44.[11]

B

Is there a risk of erroneous deprivation of defendants' interest in return of their funds if, as Colorado urges, the Exoneration Act is the exclusive remedy? Indeed yes, for the Act conditions refund on defendants' proof of innocence by clear and convincing evidence. §13–65–101(1)(a). But to get their money back, defendants should not be saddled with any proof burden. Instead, as explained *supra*, at 6–7, they are entitled to be presumed innocent.

Furthermore, as Justice Hood noted in dissent, the Act

────────────

[11] The dissent echoes Colorado's argument. If Nelson and Madden prevailed at trial, the dissent agrees, no costs, fees, or restitution could be exacted. See *post*, at 6. But if they prevailed on appellate inspection, the State gets to keep their money. See *ibid.* Under Colorado law, as the dissent reads the Colorado Supreme Court's opinion, "moneys lawfully exacted pursuant to a valid conviction become public funds (or[, in the case of restitution,] the victims' money)." *Post*, at 3–4. Shut from the dissent's sights, however, the convictions pursuant to which the State took petitioners' money were *invalid*, hence the State had no legal right to retain their money. Given the invalidity of the convictions, does the Exoneration Act afford sufficient process to enable the State to retain the money? Surely, it does not.

provides no remedy at all for any assessments tied to invalid misdemeanor convictions (Nelson had three). 362 P. 3d, at 1081, n. 1; see §13–65–102(1)(a). And when amounts a defendant seeks to recoup are not large, as is true in Nelson's and Madden's cases, see *supra*, at 2, the cost of mounting a claim under the Exoneration Act and retaining a lawyer to pursue it would be prohibitive.[12]

Colorado argued on brief that if the Exoneration Act provides sufficient process to compensate a defendant for the loss of her liberty, the Act should also suffice "when a defendant seeks compensation for the less significant deprivation of monetary assessments paid pursuant to a conviction that is later overturned." Brief for Respondent 40. The comparison is inapt. Nelson and Madden seek restoration of funds they paid to the State, not compensation for temporary deprivation of those funds. Petitioners seek only their money back, not interest on those funds for the period the funds were in the State's custody. Just as the restoration of liberty on reversal of a conviction is not compensation, neither is the return of money taken by the State on account of the conviction.

Colorado also suggests that "numerous pre- and post-deprivation procedures"—including the need for probable cause to support criminal charges, the jury-trial right, and the State's burden to prove guilt beyond a reasonable doubt—adequately minimize the risk of erroneous deprivation of property. *Id.*, at 31; see *id.*, at 31–35. But Colorado misperceives the risk at issue. The risk here involved is not the risk of wrongful or invalid conviction *any* criminal defendant may face. It is, instead, the risk faced by a defendant whose conviction has already been overturned

—————

[12] A successful petitioner under the Exoneration Act can recover reasonable attorney's fees, §13–65–103(2)(e)(IV), but neither a defendant nor counsel is likely to assume the risk of loss when amounts to be gained are not worth the candle.

that she will not recover funds taken from her solely on
the basis of a conviction no longer valid.  None of the
above-stated procedures addresses that risk, and, as just
explained, the Exoneration Act is not an adequate rem-
edy for the property deprivation Nelson and Madden
experienced.[13]

C

Colorado has no interest in withholding from Nelson
and Madden money to which the State currently has zero
claim of right.  "Equitable [c]onsiderations," Colorado
suggests, may bear on whether a State may withhold
funds from criminal defendants after their convictions
are overturned.  Brief for Respondent 20–22.  Colorado,
however, has identified no such consideration relevant
to petitioners' cases, nor has the State indicated any
way in which the Exoneration Act embodies "equitable
considerations."

IV

Colorado's scheme fails due process measurement be-
cause defendants' interest in regaining their funds is high,
the risk of erroneous deprivation of those funds under the
Exoneration Act is unacceptable, and the State has shown
no countervailing interests in retaining the amounts in
question.  To comport with due process, a State may not
impose anything more than minimal procedures on the
refund of exactions dependent upon a conviction subse-
quently invalidated.

_____

[13] Colorado additionally argues that defendants can request a stay of
sentence pending appeal, thereby reducing the risk of erroneous depri-
vation.  See Brief for Respondent 32; §§16–12–103, 18–1.3–702(1)(a)
(2016).  But the State acknowledged at oral argument that few defend-
ants can meet the requirements a stay pending appeal entails.  Tr. of
Oral Arg. 33–34.  And even when a stay is available, a trial court "may
require the defendant to deposit the whole or any part of the . . . costs."
Colo. App. Rule 8.1(a)(3) (2016).

Opinion of the Court

\*    \*    \*

The judgments of the Colorado Supreme Court are reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of these cases.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1256

_____

## SHANNON NELSON, PETITIONER *v.* COLORADO

## LOUIS A. MADDEN, PETITIONER *v.* COLORADO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
COLORADO

[April 19, 2017]

JUSTICE ALITO, concurring in the judgment.

I agree that the judgments of the Colorado Supreme Court must be reversed, but I reach that conclusion by a different route.

I

The proper framework for analyzing these cases is provided by *Medina* v. *California*, 505 U. S. 437 (1992). *Medina* applies when we are called upon to "asses[s] the validity of state procedural rules which . . . are part of the criminal process," *id.*, at 443, and that is precisely the situation here. These cases concern Colorado's rules for determining whether a defendant can obtain a refund of money that he or she was required to pay pursuant to a judgment of conviction that is later reversed. In holding that these payments must be refunded, the Court relies on a feature of the criminal law, the presumption of innocence. And since the Court demands that refunds occur either automatically or at least without imposing anything more than "minimal" procedures, see *ante*, at 10, it appears that they must generally occur as part of the criminal case. For these reasons, the refund obligation is surely "part of the criminal process" and thus falls squarely within the scope of *Medina*. The only authority cited by the Court in support of its contrary conclusion is a footnote

in a dissent. See *ante*, at 6 (citing *Kaley* v. *United States*, 571 U. S. \_\_\_, \_\_\_, n. 4 (2014) (opinion of ROBERTS, C. J.) (slip op., at 10–11, n. 4)). Under *Medina*, a state rule of criminal procedure not governed by a specific rule set out in the Bill of Rights violates the Due Process Clause of the Fourteenth Amendment only if it offends a fundamental and deeply rooted principle of justice. 505 U. S., at 445. And "[h]istorical practice is probative of whether a procedural rule can be characterized as fundamental." *Id.*, at 446. Indeed, petitioners invite us to measure the Colorado scheme against traditional practice, reminding us that our "'first due process cases'" recognized that "'traditional practice provides a touchstone for constitutional analysis,'" Brief for Petitioners 26 (quoting *Honda Motor Co.* v. *Oberg*, 512 U. S. 415, 430 (1994)). Petitioners then go on to argue at some length that "[t]he traditional rule has always been that when a judgment is reversed, a person who paid money pursuant to that judgment is entitled to receive the money back." Brief for Petitioners 26; see *id.*, at 26–30. See also Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 4–14 (discussing traditional practice).

The Court, by contrast, turns its back on historical practice, preferring to balance the competing interests according to its own lights. The Court applies the balancing test set out in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), a modern invention "first conceived" to decide what procedures the government must observe before depriving persons of novel forms of property such as welfare or Social Security disability benefits. *Dusenbery* v. *United States*, 534 U. S. 161, 167 (2002). Because these interests had not previously been regarded as "property," the Court could not draw on historical practice for guidance. *Mathews* has subsequently been used more widely in civil cases, but we should pause before applying its balancing test in matters of state criminal procedure. "[T]he States

have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition." *Medina, supra,* at 445–446. Applying the *Mathews* balancing test to established rules of criminal practice and procedure may result in "undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Medina, supra,* at 443. Where long practice has struck a particular balance between the competing interests of the State and those charged with crimes, we should not lightly disturb that determination. For these reasons, *Medina*'s historical inquiry, not *Mathews,* provides the proper framework for use in these cases.[1]

## II

Under *Medina*, the Colorado scheme at issue violates due process. American law has long recognized that when an individual is obligated by a civil judgment to pay money to the opposing party and that judgment is later reversed, the money should generally be repaid. See, *e.g., Northwestern Fuel Co.* v. *Brock*, 139 U. S. 216, 219 (1891) ("The right of restitution of what one has lost by the enforcement of a judgment subsequently reversed has been recognized in the law of England from a very early period . . . "); *Bank*

———————

[1] In a footnote, the Court briefly opines on how a *Medina* analysis would come out in these cases. The Court's discussion of the issue, which is dictum, is substantially incomplete. The Court suggests that *Medina* would support its judgment because the presumption of innocence is deeply rooted and fundamental. *Ante,* at 7, n. 9. It is true, of course, that this presumption is restored when a conviction is reversed. But that says very little about the question at hand: namely, what must *happen* once that presumption is restored. Notably, the Court cites not a single case applying the presumption of innocence in the refund context. At the same time, the Court ignores cases that bear directly on the question in these cases and thus must be part of a proper *Medina* inquiry. See *infra,* at this page and 4–5.

*of United States* v. *Bank of Washington*, 6 Pet. 8, 17 (1832) ("On the reversal of an erroneous judgment, the law raises an obligation in the party to the record, who has received the benefit of the erroneous judgment, to make restitution to the other party for what he has lost"). This was "a remedy well known at common law," memorialized as "a part of the judgment of reversal which directed 'that the defendant be restored to all things which he has lost on occasion of the judgment aforesaid.'" 2 Ruling Case Law §248, p. 297 (W. McKinney and B. Rich eds. 1914); *Duncan* v. *Kirkpatrick*, 13 Serg. & Rawle 292, 294 (Pa. 1825).

As both parties acknowledge, this practice carried over to criminal cases. When a conviction was reversed, defendants could recover fines and monetary penalties assessed as part of the conviction. Brief for Respondent 20–21, and n. 7; Reply Brief 7–8, 11; see, *e.g.,* Annot., Right To Recover Back Fine or Penalty Paid in Criminal Proceeding, 26 A. L. R. 1523, 1532, §VI(a) (1923) ("When a judgment imposing a fine, which is paid, is vacated or reversed on appeal, the court may order restitution of the amount paid . . . "); 25 C. J. §39, p. 1165 (W. Mack, W. Hale, & D. Kiser eds. 1921) ("Where a fine illegally imposed has been paid, on reversal of the judgment a writ of restitution may issue against the parties who received the fine").

The rule regarding recovery, however, "even though general in its application, [was] not without exceptions." *Atlantic Coast Line R. Co.* v. *Florida*, 295 U. S. 301, 309 (1935) (Cardozo, J.). The remedy was "equitable in origin and function," and return of the money was "'not of mere right,'" but "'rest[ed] in the exercise of a sound discretion.'" *Id.*, at 309, 310 (quoting *Gould* v. *McFall*, 118 Pa. 455, 456 (1888)). This was true in both civil and criminal cases. See, *e.g.*, 25 C. J., at 1165 (noting that "restitution [of fines paid on a conviction later reversed] is not necessarily a matter of right"); Annot., 26 A. L. R., at 1532, §VI(a) (Restitution for fines upon reversal of a conviction

"is not a matter of strict legal right, but rather one for the exercise of the court's discretion"). The central question courts have asked is whether "the possessor will give offense to equity and good conscience if permitted to retain [the successful appellant's money]." *Atlantic Coast Line*, *supra*, at 309.

This history supports the Court's rejection of the Colorado Exoneration Act's procedures. The Act places a heavy burden of proof on defendants, provides no opportunity for a refund for defendants (like Nelson) whose misdemeanor convictions are reversed, and excludes defendants whose convictions are reversed for reasons unrelated to innocence. Brief for Respondent 8, 35, n. 18. These stringent requirements all but guarantee that most defendants whose convictions are reversed have no realistic opportunity to prove they are deserving of refunds. Colorado has abandoned historical procedures that were more generous to successful appellants and incorporated a court's case-specific equitable judgment. Instead, Colorado has adopted a system that is harsh, inflexible, and prevents most defendants whose convictions are reversed from demonstrating entitlement to a refund. Indeed, the Colorado General Assembly made financial projections based on the assumption that only one person every five years would qualify for a financial award under the Exoneration Act. Colorado Legislative Council Staff Fiscal Note, State and Local Revised Fiscal Impact, HB 13–1230, p. 2 (Apr. 22, 2013), online at http://leg.colorado.gov (as last visited Apr. 17, 2017). Accordingly, the Exoneration Act does not satisfy due process requirements. See *Cooper* v. *Oklahoma*, 517 U. S. 348, 356 (1996) (A state rule of criminal procedure may violate due process where "a rule significantly more favorable to the defendant has had a long and consistent application").

### III

Although long-established practice supports the Court's judgment, the Court rests its decision on different grounds. In its *Mathews* analysis, the Court reasons that the reversal of petitioners' convictions restored the presumption of their innocence and that "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Ante*, at 7. The implication of this brief statement is that under *Mathews*, reversal restores the defendant to the *status quo ante*, see *ante*, at 3. But the Court does not confront the obvious implications of this reasoning.

For example, if the *status quo ante* must be restored, why shouldn't the defendant be compensated for all the adverse economic consequences of the wrongful conviction?[2] After all, in most cases, the fines and payments that a convicted defendant must pay to the court are minor in comparison to the losses that result from conviction and imprisonment, such as attorney's fees, lost income, and damage to reputation. The Court cannot convincingly explain why *Mathews*' amorphous balancing test stops short of requiring a full return to the *status quo ante* when a conviction is reversed. But *Medina* does.

The American legal system has long treated compensation for the economic consequences of a reversed conviction very differently from the refund of fines and other payments made by a defendant pursuant to a criminal judgment. Statutes providing compensation for time

--------

[2] The Court's position is also at odds with other principles of our procedural due process jurisprudence. It is well settled, for example, that a plaintiff who is deprived of property with inadequate process is not entitled to be compensated if the defendant can prove the deprivation "would have occurred even if [the plaintiff] had been given due process." *Thompson* v. *District of Columbia*, 832 F. 3d 339, 346 (CADC 2016); see *Carey* v. *Piphus*, 435 U. S. 247, 260, 263 (1978). This principle is in obvious tension with the Court's holding.

wrongfully spent in prison are a 20th-century innovation: By 1970, only the Federal Government and four States had passed such laws. King, Compensation of Persons Erroneously Confined by the State, 118 U. Pa. L. Rev. 1091, 1109 (1970); *United States* v. *Keegan*, 71 F. Supp. 623, 626 (SDNY 1947) ("[T]here seems to have been no legislation by our Government on this subject" until 1938). Many other jurisdictions have done so since, but under most such laws, compensation is not automatic. Instead, the defendant bears the burden of proving actual innocence (and, sometimes, more). King*, supra*, at 1110 ("The burden of proving innocence in the compensation proceeding has from the start been placed upon the claimant"); see also Kahn, Presumed Guilty Until Proven Innocent: The Burden of Proof in Wrongful Conviction Claims Under State Compensation Statutes, 44 U. Mich. J. L. Reform 123, 145 (2010) (Most U. S. compensation statutes "require that claimants prove their innocence either by a preponderance of the evidence or by clear and convincing evidence" (footnote omitted)). In construing the federal statute, courts have held that a compensation proceeding "is not . . . a criminal trial" and that the burden of proof can be placed on the petitioner. *United States* v. *Brunner*, 200 F. 2d 276, 279 (CA6 1952). As noted, Colorado and many other States have similar statutes designed narrowly to compensate those few persons who can demonstrate that they are truly innocent. The Court apparently acknowledges that these statutes pose no constitutional difficulty. That is the correct conclusion, but it is best justified by reference to history and tradition.

## IV

The Court's disregard of historical practice is particularly damaging when it comes to the question of restitution. The Court flatly declares that the State is "obliged to refund . . . restitution" in just the same way as fees and

court costs. *Ante*, at 1. This conclusion is not supported by historical practice, and it overlooks important differences between restitution, which is paid to the victims of an offense, and fines and other payments that are kept by the State.

Although restitution may be included in a criminal judgment, it has many attributes of a civil judgment in favor of the victim. This is clear under Colorado law. Although the obligation to pay restitution is included in the defendant's sentence, restitution results in a final civil judgment against the defendant in favor of the State *and the victim*. Colo. Rev. Stat. §18–1.3–603(4)(a)(I) (2016). Entitlement to restitution need not be established beyond a reasonable doubt or in accordance with standard rules of evidence or criminal procedure. *People* v. *Pagan*, 165 P. 3d 724, 729 (Colo. App. 2006); Colo. Rev. Stat. §§18–1.3–603(2)–(3). And the judgment may be enforced either by the State or the victim. §§16–18.5–106(2), §§16–18.5–107(1)–(4).

The Court ignores the distinctive attributes of restitution, but they merit attention. Because a restitution order is much like a civil judgment, the reversal of the defendant's criminal conviction does not necessarily undermine the basis for restitution. Suppose that a victim successfully sues a criminal defendant civilly and introduces the defendant's criminal conviction on the underlying conduct as (potentially preclusive) evidence establishing an essential element of a civil claim. See, *e.g.*, 2 K. Broun, McCormick on Evidence §298, 473–477 (7th ed. 2013) (discussing the admissibility, and potential preclusive effect, of a criminal conviction in subsequent civil litigation). And suppose that the defendant's criminal conviction is later reversed for a trial error that did not (and could not) infect the later civil proceeding: for example, the admission of evidence barred by the exclusionary rule or a Confrontation Clause violation. It would be unprecedented to suggest that due

process requires unwinding the civil judgment simply because it rests in part on a criminal conviction that has since been reversed. And a very similar scenario could unfold with respect to a Colorado restitution judgment. The only salient difference would be that, in the Colorado case, the civil judgment would have been obtained as part of the criminal proceeding itself. It is not clear (and the Court certainly does not explain) why that formal distinction should make a substantive difference.[3]

It is especially startling to insist that a State must provide a refund after enforcing a restitution judgment on the victims' behalf in reliance on a *final* judgment that is then vacated on *collateral* review. Faced with this fact pattern, the Ninth Circuit declined to require reimbursement, reasoning that the Government was a mere "escrow agent" executing a then-valid final judgment in favor of a third party. *United States* v. *Hayes*, 385 F. 3d 1226, 1230 (2004).

The Court regrettably mentions none of this. Its treatment of restitution is not grounded in any historical analysis, and—save for a brief footnote, *ante*, at 2–3, n. 3—the Court does not account for the distinctive civil status of restitution under Colorado law (or the laws of the many other affected jurisdictions that provide this remedy to crime victims).

Nor does the Court consider how restitution's unique characteristics might affect the balance that it strikes under *Mathews*. *Ante,* at 10. The Court summarily rejects

─────────

[3] The Court cites one intermediate appellate case for the proposition that when a conviction is reversed, any restitution order dependent on that conviction is simultaneously vacated. *Ante*, at 2–3, n. 3 (citing *People* v. *Scearce*, 87 P. 3d 228 (Colo. App. 2003)). *Scearce* did not discuss whether any payments had been made to victims or—if so— whether they would be recoverable from the State. More important, *Scearce* is hardly the last word on the question whether due process invariably requires the refund of restitution.

the proposition that "'equitable considerations'" might militate against a blanket rule requiring the refund of money paid as restitution, see *ibid.*, but why is this so? What if the evidence amply establishes that the defendant injured the victims to whom restitution was paid but the defendant's conviction is reversed on a ground that would be inapplicable in a civil suit? In that situation, is it true, as the Court proclaims, that the State would have "no interest" in withholding a refund? Would the Court reach that conclusion if state law mandated a refund from the recipients of the restitution? And if the States and the Federal Government are always required to foot the bill themselves, would that risk discourage them from seeking restitution—or at least from providing funds to victims until the conclusion of appellate review?

It was unnecessary for the Court to issue a sweeping pronouncement on restitution. But if the Court had to address this subject to dispose of these cases, it should have acknowledged that—at least in some circumstances—refunds of restitution payments made under later reversed judgments are not constitutionally required.

\* \* \*

For these reasons, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1256

_____

SHANNON NELSON, PETITIONER *v.* COLORADO

LOUIS A. MADDEN, PETITIONER *v.* COLORADO

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
COLORADO

[April 19, 2017]

JUSTICE THOMAS, dissenting.

The majority and concurring opinions debate whether the procedural due process framework of *Mathews* v. *Eldridge*, 424 U. S. 319 (1976), or that of *Medina* v. *California*, 505 U. S. 437 (1992), governs the question before us. But both opinions bypass the most important question in these cases: whether petitioners can show a *substantive* entitlement to a return of the money they paid pursuant to criminal convictions that were later reversed or vacated.

The Court assumes, without reference to either state or federal law, that defendants whose convictions have been reversed have a substantive right to any money exacted on the basis of those convictions. By doing so, the Court assumes away the real issue in these cases. As the parties have agreed, the existence of Colorado's obligation to provide particular procedures depends on whether petitioners have a substantive entitlement to the money. Colorado concedes that "if [petitioners] have a present entitlement" to the money—that is, if "it is their property"—"then due process requires [the State to accord] them some procedure to get it back." Tr. of Oral Arg. 52. And Colorado acknowledges that the procedural hurdles it could impose before returning the money "would be fairly minimal," *id.*, at 51, because petitioners would need to

prove only that their convictions had been reversed and that they had paid a certain sum of money, see *ibid.* Similarly, petitioners concede that if defendants in their position do *not* have a substantive right to recover the money—that is, if the money belongs to the State—then Colorado need not "provide any procedure to give it back." *Id.*, at 53. If defendants in their position have no entitlement to the money they paid pursuant to their reversed convictions, there would be nothing to adjudicate. In light of these concessions, I can see no justification for the Court's decision to address the procedures for adjudicating a substantive entitlement while failing to determine whether a substantive entitlement exists in the first place.

In my view, petitioners have not demonstrated that defendants whose convictions have been reversed possess a substantive entitlement, under either state law or the Constitution, to recover money they paid to the State pursuant to their convictions. Accordingly, I cannot agree with the Court's decision to reverse the judgments of the Colorado Supreme Court.

## I

The Fourteenth Amendment provides that no State shall "deprive any person of *life, liberty, or property*, without due process of law." U. S. Const., Amdt. 14, §1 (emphasis added).[1] To show that Colorado has violated the

———————

[1] As I have previously observed, the Due Process Clause may have originally been understood to require only "that our Government . . . proceed according to the 'law of the land'—that is, according to written constitutional and statutory provisions"—before depriving someone of life, liberty, or property. *Johnson* v. *United States*, 576 U. S. ___, ___ (2015) (THOMAS, J., concurring in judgment) (slip op., at 17) (quoting *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 589 (2004) (THOMAS, J., dissenting)). Because Colorado does not advance that argument, and because it is unnecessary to resolve the issue in these cases. I assume that the Due Process Clause requires some baseline procedures regardless of the provisions of Colorado law.

Constitution's procedural guarantees, as relevant here, petitioners must first establish that they have been deprived of a protected property interest. See *Castle Rock* v. *Gonzales*, 545 U. S. 748, 756 (2005) ("The procedural component of the Due Process Clause does not protect everything that might be described as a benefit: To have a property interest in a benefit, a person clearly must have . . . a legitimate claim of entitlement to it" (internal quotation marks omitted)). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 164 (1998) (quoting *Board of Regents of State Colleges* v. *Roth*, 408 U. S. 564, 577 (1972)). Petitioners undoubtedly have an "interest in regaining the money they paid to Colorado." *Ante*, at 6. But to succeed on their procedural due process claim, petitioners must first point to a recognized *property* interest in that money, under state or federal law, within the meaning of the Fourteenth Amendment.

## A

The parties dispute whether, under Colorado law, the petitioners or the State have a property interest in the money paid by petitioners pursuant to their convictions. Petitioners contend that the money remains their property under state law. Reply Brief 1–3; see also Tr. of Oral Arg. 52–54. Colorado counters that when petitioners paid the money pursuant to their convictions, the costs and fees became property of the State and the restitution became property of the victims. See *id.*, at 28–30; Brief for Respondent 41.

The key premise of the Colorado Supreme Court's holdings in these cases is that moneys lawfully exacted pursuant to a valid conviction become public funds (or the vic-

tims' money) under Colorado law. The Colorado Supreme
Court explained in petitioner Shannon Nelson's case that
"the trial court properly ordered [her] to pay costs, fees,
and restitution pursuant to valid statutes" and that "the
court correctly distributed th[ose] funds *to victims and
public funds*, as ordered by the statutes." 362 P. 3d 1070,
1076 (2015) (emphasis added); accord, 364 P. 3d 866, 868–
870 (2016) (applying the same analysis to petitioner Louis
Madden's case). The Colorado Supreme Court further
noted that, "[o]nce the state disburses restitution to the
victims, the state no longer controls that money." 362
P. 3d, at 1077, n. 4.

The Colorado Supreme Court explained that "Colorado's
constitution protects" the Colorado Legislature's "control
over public money," and thus a "court may authorize
refunds from public funds only pursuant to statutory
authority." *Id.*, at 1076–1077. The Exoneration Act, the
Colorado Supreme Court held, provides the only statutory
authority for refunding costs, fees, and restitution when a
defendant's conviction is overturned. *Id.*, at 1077–1078.
Because petitioners had not sought a refund under the
Exoneration Act, "the trial court lacked the authority to
order a refund of Nelson's costs, fees, and restitution." *Id.*,
at 1078; 364 P. 3d, at 867.

At no point in this litigation have petitioners attempted
to demonstrate that they satisfy the requirements of the
Exoneration Act. Under the Act, Colorado recognizes a
substantive entitlement to the kind of property at issue in
these cases only if, among other things, the defendant can
prove that he is "actually innocent."[2] Colo. Rev. Stat.

---

[2]More specifically, the Exoneration Act entitles an exonerated de-
fendant to compensation if he was convicted of a felony, was incarcer-
ated, and, among other requirements, can prove by clear and convinc-
ing evidence that he is "actually innocent," meaning that his "conviction
was the result of a miscarriage of justice" or that he is factually inno-
cent. Colo. Rev. Stat. §§13–65–101(1)(a), 13–65–102(1)(a) (2016); see

§§13–65–101, 13–65–102 (2016). It is the Exoneration Act alone which defines the scope of the substantive entitlement. This Court has interpreted the Due Process Clause to require that the States provide certain procedures, such as notice and a hearing, by which an individual can prove a substantive entitlement to (or defend against a deprivation of) property. But the Clause, properly understood, has nothing to say about the existence or scope of the substantive entitlement itself. See Part I–B, *infra*. If petitioners want this Court to rewrite the contours of the substantive entitlement contained in the Exoneration Act, they err in invoking *procedural* due process. See Reply Brief 1–2 ("Our argument sounds in *procedural* due process").

The majority responds by asserting, without citing any state law, that Colorado "had no legal right to retain [petitioners'] money" once their convictions were invalidated. *Ante*, at 8, n. 11. If this were true as a matter of state law, then certain provisions of the Exoneration Act—which require the State to return costs, fees, and restitution only in limited circumstances following a conviction's reversal—would be superfluous. Thus, to the extent the majority implicitly suggests that petitioners have a state-law right to an automatic refund (a point about which the majority is entirely unclear), it is plainly incorrect.

B

Because defendants in petitioners' position do not have a substantive right to recover the money they paid to Colorado under state law, petitioners' asserted right to an automatic refund must arise, if at all, from the Due Process Clause itself. But the Due Process Clause confers no substantive rights. *McDonald* v. *Chicago*, 561 U. S. 742,

_____

*Nelson*, 362 P. 3d, at 1075. "Insufficiency of the evidence or a legal error unrelated to the person's actual innocence cannot support either exoneration or subsequent compensation under the Act." *Ibid.*

811 (2010) (THOMAS, J., concurring in part and concurring in judgment) ("The notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words"). And, in any event, petitioners appear to disavow any substantive due process right to a return of the funds they paid. See Reply Brief 1–2; Tr. of Oral Arg. 18–19. In the absence of any property right under state law (apart from the right provided by the Exoneration Act, which petitioners decline to invoke), Colorado's refusal to return the money is not a "depriv[ation]" of "property" within the meaning of the Fourteenth Amendment. Colorado is therefore not required to provide any process at all for the return of that money.

## II

No one disputes that if petitioners had never been convicted, Colorado could not have required them to pay the money at issue. And no one disputes that Colorado cannot require petitioners to pay any additional costs, fees, or restitution now that their convictions have been invalidated. It does not follow, however, that petitioners have a property right in the money they paid pursuant to their then-valid convictions, which now belongs to the State and the victims under Colorado law. The Court today announces that petitioners have a right to an automatic refund because the State has "no legal right" to that money. *Ante*, at 8, n. 11. But, intuitive and rhetorical appeal aside, it does not seriously attempt to ground that conclusion in state or federal law. If petitioners' supposed right to an automatic refund arises under Colorado law, then the Colorado Supreme Court remains free on remand to clarify whether that right in fact exists. If it arises under substantive due process, then the Court's procedural due process analysis misses the point.

I respectfully dissent.